## UNITED STATES v. NASIF.
### No. 11593.

District Court, W. D. Louisiana,
Shreveport Division.

June 5, 1947.

Malcolm E. Lafargue, U. S. Atty., of Shreveport, La., and J. Lyle DeBellevue, Asst. U. S. Atty., of Crowley, La., for plaintiff.

Robert G. Chandler, of Shreveport, La., for defendant.

DAWKINS, District Judge.

Defendant is charged with contempt, in that she violated the terms of a writ of injunction issued pursuant to judgment of this court rendered June 26, 1946, by charging and collecting rent upon the left hand lower or first floor apartment in a building located at 1022 Dalzell Street in the city of Shreveport. The judgment and writ were issued in Civil Action No. 1756, brought by the Office of Rent Control against Mrs. Nasif.

On October 14, 1944, defendant filed a registration statement covering this space in her building as a four room apartment, showing the rental on the controlling date as $75 per month. It consisted of a living room, bedroom, bath and kitchen, with the bath between the living room and bedroom. The kitchen was on the left hand front with entrance from a screened porch which extended across the front of the building and another door into the kitchen from the left outside. In other words, the only way any tenant could have access to any of these rooms from the outside was through the kitchen, and in the case of the rear or bedroom, also through the front living room and the bath.

Upon investigation by the Rent Control Office, it was found that defendant could not show that she was or had been renting the apartment on the maximum rent date for $75 and it was accordingly set at $45 per month, as a fair rental compared to similar apartments in the neighborhood. The order of the Director was dated October 18, 1945. Eight days later defendant wrote the Director as follows: "This is to officially notify you of my intention to discontinue the renting of my apts. known as, Lower Right, Lower Left, and Upper Apt. 1022 Dalzell St. and to register them, or rather convert them into bedrooms, and

reregister them as such under your rent control rules and regulations, Form D-301, rule 76, page 14. This to take effect immediately, and upon the vacancy of each apartment. Please furnish me with the necessary blanks, by mail, so that I may conform with your rules. I shall need nine blanks, and shall register each room as per your rental value set on my rooms No. 1, No. 2, and No. 3, in the same dwelling."

On October 30th, the Director replied:

"In reply to your letter of October 26, 1945, we wish to advise you that it is our policy to have all registrations made in the office if possible. In this manner many incorrect registrations may be prevented.

"The Rent Regulations require that a registration of an accommodation be made within thirty days from the date of its first rental."

On December 31, 1945, a civil suit by the Administrator against Mrs. Nasif, No. 1756, was filed, seeking to enjoin her from collecting rent above the ceiling on an apartment at 649 Dalzell, some four blocks from No. 1022, in which latter building the apartment involved in the present proceeding is located. Service of a rule for preliminary injunction was made on defendant, February 4, 1946, which was answered on the 21st of that month. Hearing was had and a preliminary writ issued on February 28th enjoining and prohibiting her from exceeding rent ceilings as follows:

"When, after considering the pleadings and upon plaintiff offering due proof by affidavit in support of his bill of complaint, the court being of the opinion that plaintiff is entitled to the relief prayed for.

"It Is, Therefore, Ordered, Adjudged and Decreed that the defendant, Mrs. Corinne M. Nasif, of the city of Shreveport, Louisiana, her agents, servants, employees and representatives and all persons in active concert or participation with them, be, and they are hereby enjoined and restrained from directly or indirectly violating the terms and provisions of the Rent Regulation for Housing, as amended and particularly from demanding and receiving rent in excess of the maximum rent of $46.02 per month, for the use or occupancy of the said house at 649 Dalzell Street,

Shreveport, Louisiana, unless and until such maximum rent be modified or changed pursuant to and in accordance with said Rent Regulation for Housing, as amended."

The case was later heard on the merits in a regular trial and on June 26, 1946, there was judgment granting a permanent injunction in substantially the same language with specific findings of fact and conclusions of law.

In the meantime, defendant had, on January 4, 1946, filed with the Rent Control Office forms filled out for the registration of the two rooms, other than the kitchen, which was designated as "Room 104" and "Room 105" at 1022 Dalzell Street, the first as having been rented to Miss Marie Anglin and the second to Miss Frances Monk, both as of December 6, 1945, and at the rate of $30 a month. In a blocked column on the right hand side of the registration forms for each room was shown under the heading (No. 1) "Equipment" consisting of furniture, running water, hot water, toilet, bathroom, heating stove and electricity. Under (No. 2) "Services" the rental price included heating fuel, cold water, hot water, light, ice, painting and decorating, interior repairs, exterior repairs, etc. At the bottom of this column, in response to the question "Are all equipment and services indicated above now included in the rent?" the answer was "Yes." There appeared just above her signature the following: "The rent for this dwelling unit on and after the 'effective date' can be no more than the Maximum Rent entered in Section C, Item 7, unless changed by order of the Rent Director (see Section C, Item 8)."

Notwithstanding this, in a blank space under Section E she inserted in her own handwriting: "Kitchen privileges $5 per month per person, limited to four people using kitchen. This charge to be separate from room rent as bedroom."

The information called for under Section E, since she had filled in only paragraphs 4 and 7 of the form, was that she show whether there was (a) any new construction, (b) a change in the number of dwelling units, (c) a change from unfurnished to fully furnished, and (d) a major

capital improvement. The only one of these headings under which the kitchen privileges could possibly be included would seem to have been (b) "a change in the number of dwelling units."

As shown above, defendant had notified the Director of her purpose to abandon renting apartments and to rent all nine rooms in the building, as she referred to them, as "bedrooms", under the "Form D-301, Rule 76", which was as quoted in full in her answer to the rule for contempt in the present proceeding, as follows:

"Q. I want to rent out all the rooms in my apartment as sleeping rooms only. Can I do this? A. Generally, if your apartment is vacant, you may rent out rooms for sleeping purposes only. However, you must register under the Hotel and Rooming House Regulation and you are subject to its provisions if you rent to more than two paying tenants."

This "rule" informed her that in order to do so—that is, to rent the rooms as sleeping rooms only, she "must register under the hotel and rooming house regulations" and "you are subject to its provisions if you rent to more than two paying tenants". However, notwithstanding her references to these regulations, in her letter to the Director, she used the blank or form DD-U headed "Registration of Rental of Dwellings", and at the top of each appeared: "Do not use this form for hotels and rooming houses." In other words she used this form, apparently believing she could apply Paragraph 4 of Section C thereon (which had to do with the making available in a dwelling of additional rental units after the maximum rent date); whereas in her letter to the Director she advised him that her purpose was to convert all nine of the rooms in the building to sleeping or bedrooms under Rule 76 of Form D-301, which said rule told her very plainly she could not do except by registering under the hotel and rooming house regulations.

These forms thus filled out were offered in evidence and were before the court when the civil action on No. 1756 was tried and decided on June 26, 1946, resulting in a permanent injunction.

On the trial of this rule for contempt, the persons named in the registration forms above referred to, purporting to be a change from an apartment to sleeping or bedrooms, to wit, Miss Frances Monk and Misses Marie and Marjorie Anglin, testified most emphatically that they rented the two rooms, bath and kitchen as an apartment at the price of $75 per month, (the same figure which had been paid by prior tenants, before the rent director had reduced it to $45) and they likewise unqualifiedly denied that the defendant had said anything about renting the space as bedrooms and collecting extra for the kitchen. They stayed in the apartment from December 1945 to December 1946, paying the sum of $75 per month. There was only one bed in the apartment, which was occupied part of the time by all of them, located in the back or Room 105, and the furnishings of the front or living room were never changed from the manner in which it was furnished as a living room while being rented as an apartment.

Another witness, Mrs. Elizabeth McAuliffe, testified that she went with Mrs. Sara Riggs, who leased these same rooms as an apartment in December 1946, after the Misses Anglin and Monk left, (Mrs. Riggs was sick and could not be present at the trial); and heard the lease made as an apartment, and that she, Mrs. McAuliffe, saw Mrs. Riggs pay the defendant the sum of $75 for the month of December. Admittedly the apartment was occupied by Mr. and Mrs. Riggs, which, of course, was a single family. Defendant admitted that she had made no change in the furnishings or otherwise from what they were when the space was rented as an apartment, but gave as the reason therefor that those tenants had insisted that they wanted to use the rooms just as they were and declined her offer to fit up the living room as a bedroom. She also testified that the last tenants who had occupied the premises as an apartment had vacated the same on December 1, 1945, and that when Miss Monk and the two Misses Anglin came to her on December 6th following she had made no changes whatever, but told them she "could furnish a bed, a chest and a vanity" if they wished,

and that "I rent it as a bedroom and furnish them with their linens and their laundry and everything with kitchen privileges, if permissible by the OPA, but if not, then I would eliminate the kitchen privileges", but "they preferred to use it as a living room—a combination living room with a day bed, and they said they would alternate. One time one would sleep in the living room and they would alternate using the day bed"; that she furnished linens, covers, etc., for the two beds.

Defendant also testified that she rented the space to the Riggs for $70, $30 for each room and $10 for the kitchen privileges for two persons. She also insisted that she informed Mrs. Riggs, who came to rent the place, and with whom Mrs. McAuliffe testified she was present, that she, Mrs. Nasif, was renting the rooms as bed or sleeping rooms. The defendant also admitted that she had rented the property to Mr. and Mrs. Shivers, who had left town and did not testify, for $70, on the same basis as to Mr. and Mrs. Riggs. At no time had she furnished the front room as a bedroom prior to this rule for contempt. In other words the rooms were just as they were when listed as an apartment.

With respect to other apartments in the building, defendant also admitted she had been required to reduce the rent, on one from $35 to $25, and although the Rent Control Office had refused to classify a kitchen as a special unit, she required the tenant to pay $10 for the use of the kitchen, as against the $5 they had paid before, in order to bring the revenue up to the original $35.

Of course, the defendant in this case seriously contends that because she had written the Rent Control Office of her purpose to discontinue renting apartments and had proceeded as she did for approximately a year without further advice or complaint from the Director's office, she was in good faith and even though technically wrong could not be held guilty of a wilful contempt.

The record in both the civil suit and in this proceeding indicate rather clearly, and it is believed beyond a reasonable doubt, that the defendant, Mrs. Corinne Nasif, was not willing to conform to the rules which the Rent Control Office had fixed for her properties, and that she resorted to every possible scheme to evade them and to continue to collect the prices which she herself thought they should bring. Had she been in good faith in changing from an apartment basis to the renting of rooms for sleeping purposes only (having notified the rent office that she had nine units in the building which she intended to rent in that manner) she should have equipped them as such and provided means of access thereto by the individual tenants just as is required in rooming houses and hotels. Furthermore, she had before her eyes when she filled out these forms, at the top of the page, notice that rooming houses could not be registered under those forms, and the Rule which she referred to, in telling the rent director she intended to rent them as sleeping rooms, but required her to register under a different regulation governing such rooming houses. Her purpose is also emphasized by the fact that in the notation which she made at the bottom of these forms she attempted to extract every penny that she could, notwithstanding, ordinarily if a single room is occupied by one or more tenants and they cook their meals, it becomes a single or family operation done at one time and could scarcely be considered as independent privileges for every person occupying the rooms. It is true that she limited the number of persons who could use the kitchen, but had there been the maximum of four which she named, then she would have collected on each room not only the $30 but an additional $10 per month, thus realizing a total of $80 for the apartment, without any changes or rearrangment of furniture, on which the rent had been set by the Director at $45 a month.

A careful study of the record convinces me that I was correct in the announcement made at the conclusion of the trial, that is, that the defendant was guilty of a wilful contempt in attempting to evade the terms of the writ of injunction. An examination of the law has also satisfied me that the writ of injunction, as issued in the civil suit, did not exceed the scope

which it could cover in proceedings to compel a landlord to conform to the rents fixed upon properties of the same general type and location as they were in this case. While it is not permissible to enjoin one generally from violating a statute, yet, where it is shown, as here, that the defendant has been guilty of violations of a certain class or type, the suit may cover future violations of the same nature. See National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 699, 85 L.Ed. 930. The following is quoted from that opinion:

"A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past. But the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged. This Court will strike from an injunction decree restraints upon the commission of unlawful acts which are thus dissociated from those which a defendant has committed. Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; New York, N. H. & H. R. Co. v. Interstate Commerce Comm'n, 200 U.S. 361, 404, 26 S.Ct. 272, 282, 50 L.Ed. 515, and see under the National Labor Relations Act [29 U.S.C.A. § 151 et seq.], National Labor Relations Board v. Swift & Co., 7 Cir., 108 F.2d 988.

"It is a salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts. But we think that without sacrifice of that principle, the National Labor Relations Act does not contemplate that an employer who has unlawfully refused to bargain with his employees shall for the indefinite future, conduct his labor relations at the peril of a summons for contempt on the Board's allegation, for example, that he has discriminated against a labor union in the discharge of an employee, or because his supervisory employees have advised other employees not to join a union. See e. g., H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309."

The language of the writ in the present case was certainly broad enough to cover the conduct of the defendant and, as stated earlier, these identical registrations were before this court in the civil proceedings. No. 1756. If she thought the judgment was too broad in the civil case, her remedy was by appeal. See Swift & Co. v. United States, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587; Brotherhood, etc. v. Texas & N. O. R. Co., D.C., 24 F.2d 426.

It is the conclusion of this court that defendant did knowingly and wilfully violate the writ of injunction herein by collecting rents upon the premises as an apartment in excess of those fixed by the Office of Rent Control, in that she did collect and receive the sum of $75 per month when the maximum allowed was $45.

The defendant will be directed to appear before this court at Shreveport at 10 o'clock a. m. on June 16, 1947, for a formal adjudication of this matter and the imposition of a proper sentence.

Proper decree should be presented.